625 S.E.2d 312

**APPALACHIAN EMERGENCY MEDICAL SERVICES, INC.,**
Petitioner Below, Appellant,

v.

**STATE TAX COMMISSIONER,**
Respondent Below,
Appellee.

No. 32695.

Supreme Court of Appeals of West Virginia.

Submitted: Oct. 11, 2005.

Filed: Nov. 29, 2005.

Jason C. Workman, Esq., Karen H. Miller, Esq., Miller, Snyder, Weiler & Walters, Charleston, for Appalachian Emergency Medical Services, Inc.

Darrell V. McGraw, Jr., Esq., Attorney General, Stephen Stockton, Esq., Senior Assistant Attorney General, Charleston, for State Tax Commissioner.

The Opinion of the Court was delivered PER CURIAM.

Justice STARCHER concurs and reserves the right to file a concurring opinion.

## PER CURIAM.

Appellant, Appalachian Emergency Medical Services, Inc., appeals the October 19, 2004, order of the Circuit Court of Cabell County that affirmed the State Tax Commissioner's ruling that Appalachian Emergency Medical Service's Huntington property does not qualify for an exemption from the *ad valorem* property tax. After careful consideration of this matter, we reverse the circuit court.

---

1. Internal Revenue Code § 501(c)(3) provides in pertinent part that "Corporations ... organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes" are entitled to tax exemption.

2. TSN is also designated as exempt from federal taxation under section 501(c)(3) of the Internal Revenue Code.

3. According to W.Va.Code § 11–3–24a, in part:

## I.

## FACTS

Appellant Appalachian Emergency Medical Services, Inc. (hereafter "AEMS") is a nonprofit corporation that was organized to assist emergency medical services in certain West Virginia counties. AEMS is exempt from paying federal income taxes pursuant to section 501(c)(3) of the Internal Revenue Code.[1] In March 2000, AEMS purchased a building in Huntington and began leasing it to the West Virginia Emergency Medical Services Technical Support Network ("TSN"), a State-wide nonprofit organization[2] that provides support services to county-level based emergency services organizations. TSN is funded through federal and State grants, but AEMS receives no such support.

AEMS financed the purchase of the property with a bank loan of $500,000.00 which is guaranteed by TSN. The initial interest rate on the 15–year loan was 9.25%, but that rate is adjusted annually. At the time of the February 5, 2003, circuit court hearing, the loan interest rate had declined to 5%. The original terms of the 15–year lease between AEMS and TSN provided that TSN would make monthly lease payments of $5,500.00. However, these payments had decreased to $5,100.00 as of the time of the 2003 hearing because AEMS had built up sufficient funds in its escrow account to cover future maintenance and repairs on its property.

The Cabell County Assessor claimed that AEMS' property is subject to *ad valorem* property taxation which was disputed by AEMS. The parties brought the matter before the Appellee herein, the State Tax Commissioner, pursuant to W.Va.Code § 11–3–24a (1961).[3] The Tax Commissioner subse-

At any time after property is returned for taxation and up to and including the time the property books are before the county court [county commission] for equalization and review, any taxpayer may apply to the assessor for information regarding the classification and taxability of his property. In case the taxpayer ... believes that such property is exempt or otherwise not subject to taxation, he shall file his objections in writing with the assessor. The assessor shall decide the ques-

quently ruled that AEMS' property is not exempt from taxation. The Tax Commissioner found that because TSN paid a monthly lease payment of $5,500.00 and AEMS paid $5,100.00 per month in mortgage payments, AEMS was collecting "market rent" on its property. Based on W.Va.Code § 11-3-9(a)(12) (2005)[4] which provides a tax exemption for property "used for charitable purposes, and not held or leased out for profit," the Tax Commissioner concluded that AEMS' property, because it is leased out for a profit, is not tax exempt.[5]

AEMS appealed the Tax Commissioner's ruling to the Circuit Court of Cabell County.[6] After a hearing on the matter, the circuit court affirmed the Tax Commissioner's ruling. AEMS now appeals the circuit court's decision.

## II.

## STANDARD OF REVIEW

■ We have defined the scope of appellate review of a circuit court order as follows:

> In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of

review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syllabus Point 2, *Walker v. West Virginia Ethics Com'n*, 201 W.Va. 108, 492 S.E.2d 167 (1997). With this standard in mind, we now consider the issue before us.

## III.

## DISCUSSION

AEMS asserts that its property should be exempt from paying *ad valorem* property taxes because it is a charitable nonprofit corporation pursuant to § 501(c)(3) of the Internal Revenue Code; TSN, also a charitable organization, uses the property for the charitable purpose of supporting EMS systems throughout the State; and the property is not being leased or held out for profit because the lease payment equals the mortgage payment.

■ The Tax Commissioner, on the other hand, avers that AEMS' primary and immediate use of the property is as rental property, which is not an exempt use.[7] Also,

---

tion by either sustaining the protest and making proper corrections, or by stating, in writing if requested, the reasons for his refusal. The assessor may, and if the taxpayer requests, the assessor shall, certify the question to the state tax commissioner in a statement sworn to by both parties, or if the parties are unable to agree, in separate sworn statements, giving a full description of the property and any other information which the tax commissioner may require.

4. At the time the Tax Commissioner rendered its decision, the 1998 version of W.Va.Code § 11-3-9 was in effect. However, the relevant language was not changed by the 2005 amendment. Thus, this Court will cite to the 2005 version.

5. Rebecca Melton Craig was Tax Commissioner at the time of the February 28, 2002, ruling. Virgil T. Helton is the current Tax Commissioner.

6. West Virginia Code § 11-3-24a provides that "either the assessor or the taxpayer may apply to the circuit court of the county for the review of the question of ... taxability[.]"

7. The Tax Commissioner appears to reason in its order that property that is leased, regardless of

whether or not it makes a profit, cannot be tax exempt. For example, the Tax Commissioner frames the issue as "[w]hether real property owned by a 501(c)(3) organization and leased to another 501(c)(3) organization is exempt from ad valorem property taxation." In addition, the Tax Commissioner states that,

> When determining whether property is exempt, it is necessary to bear in mind that it is the use by the owner that determines whether exemption applies. The question then is whether Taxpayer is using the property for charitable purposes and not holding the property or leasing out the property for profit[.]

The Tax Commissioner's analysis is incorrect. The dispositive question is whether the property is being leased by the charitable organization *for profit*, and not simply whether it is being leased.

Also, the Tax Commissioner based its ruling in part on the fact that TSN "appears to have a freely assignable lease." However, the facts before this Court are that TSN used the property for charitable purposes and did not assign the lease.

Finally, the Tax Commissioner avers that although TSN uses the property in furtherance of its charitable purpose, TSN is neither the property owner nor the taxpayer, and thus TSN's use of

the Tax Commissioner disputes AEMS' claim that it is not turning a profit. The Tax Commissioner found that AEMS' initial mortgage rate of 9.25% had declined at the time of the hearing below to 5%, while the lease payment charged per month had not declined. Thus, AEMS has collected more in rent than is due under the mortgage. The Tax Commissioner also found that AEMS had continued to pay the same amount each month on the mortgage which permitted it to claim that the lease payment it received each month equaled its mortgage payment. According to the Tax Commissioner, however, the fact that AEMS' actual monthly mortgage payment was in excess of what was due under the mortgage schedule indicated that AEMS was making a profit.

 Our State Constitution provides that property used for "educational, literary, scientific, religious or charitable purposes" may by law be exempted from taxation. *W.Va. Const.*, Art. X, Section 1. "The ... Constitution does not exempt property from taxation, but [it] empowers the legislature to create exemptions for certain types of property." *Wellsburg Unity Apts., Inc. v. County Com'n of Brooke Co.*, 202 W.Va. 283, 286, 503 S.E.2d 851, 854 (1998). In West Virginia Code § 11–3–9(a)(12) (2005), the Legislature provided an exemption from taxation for "[p]roperty used for charitable purposes, and not held or leased out for profit." This Court has held that "[u]nder section 1, art. 10, Const., the exemption of property from taxation depends on its use. To warrant such an exemption for a purpose there stated, the use must be primary and immediate, not secondary or remote." Syllabus, *State ex rel. Farr v. Martin*, 105 W.Va. 600, 143 S.E. 356 (1928). We also have recognized that "[w]here a person claims an exemption from a law imposing a license or tax, such law is strictly construed against the person claim-

ing the exemption." Syllabus Point 2, *State ex rel. Lambert v. Carman*, 145 W.Va. 635, 116 S.E.2d 265 (1960).

 The resolution of this case is governed by this Court's holdings in *Wellsburg Unity Apts., Inc. v. County Com'n of Brooke Co., supra.* In Syllabus Point 2 of *Wellsburg*, we held that "[r]eal property that is used exclusively for charitable purposes and is not held or leased out for profit is exempt from ad valorem real property taxation. W.Va.Code § 11–3–9 (1990)." We further held in Syllabus Point 3 that,

> In order for real property to be exempt from ad valorem property taxation, a two-prong test must be met: (1) the corporation or other entity must be deemed to be a charitable organization under 26 U.S.C. § 501(c)(3) or 501(c)(4) as is provided in 110 C.S.R. § 3–19.1; and (2) the property must be used exclusively for charitable purposes and must not be held or leased out for profit as is provided in W.Va.Code § 11–3–9.

We will now apply this rule to the facts before us.

 First, we find that AEMS is deemed to be a charitable organization under § 501(c)(3) of the Internal Revenue Code. The evidence shows that AEMS is exempt from federal income taxes under § 501(c)(3). In Syllabus Point 1 of *Wellsburg, supra,* this Court held that "[w]hen a corporation is granted a tax exempt status under Section 501(c)(3) of the Internal Revenue Code of 1986, that corporation is deemed to be a charitable organization under 110 C.S.R. § 3–19.1." Therefore, AEMS is deemed to be a charitable organization and meets the first prong of the test set forth in *Wellsburg*.[8]

 Next, under the second prong of *Wellsburg*'s two-prong test, we find that the

---

the property as the lessee is remote and secondary to AEMS' ownership. We disagree with this reasoning. The second prong of the test this Court set forth in *Wellsburg Unity Apts., Inc. v. County Com'n of Brooke Co.*, 202 W.Va. 283, 503 S.E.2d 851 (1998) requires simply that the property at issue is used exclusively for charitable purposes, not that the Taxpayer must use the property directly for a charitable purpose. Likewise, 110 C.S.R. § 3–19.1 requires merely that

"in order for the property to be exempt, the primary and immediate use of the property must be for one or more exempt purposes."

8. In its order, the Tax Commissioner stated "[w]e do not make any opinion as to whether [AEMS] is a charitable organization." The circuit court also made no finding on AEMS' charitable status.

property at issue is used exclusively for charitable purposes. The evidence shows that TSN is a charitable and nonprofit corporation under Internal Revenue Code § 501(c)(3), and that its purpose and mission is to provide a variety of support services to the State's health care industry, including county-level emergency service organizations.[9] The evidence further shows that, consistent with this mission, TSN uses the property at issue to house administrative offices, its Huntington field office, a conference room, a classroom, telecommunications operations, a storage area, and computer server rooms. According to 110 C.S.R. § 3–2.10,

> The term "charity" means a gift to be applied consistently with the existing laws, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government. It is immaterial whether the purpose is called charitable in the gift itself if it is so described as to show that it is charitable. Any gift not inconsistent with existing laws which is promotive of

science or tends to the education, enlightenment, benefit or amelioration of the condition of mankind or the diffusion of useful knowledge, or is for the public convenience is a charity.

We conclude that the property is used for charitable purposes in that TSN uses it to further its mission of assisting emergency services organizations to relieve human suffering.[10]

■■■ Finally, having found that AEMS is a charitable organization under 26 U.S.C. § 501(c)(3), and that its property is used exclusively for charitable purposes, we must now determine whether AEMS leases out to TSN for profit. This is the issue upon which the Tax Commissioner and the circuit court decided this case below. As noted previously, the Tax Commissioner found that, because the amount that AEMS collected from TSN as a monthly lease payment exceeded AEMS' mortgage payment, AEMS was collecting "market rent." The circuit court agreed with the Tax Commissioner. We believe these findings to be in error.

The lease entered into between AEMS and TSN indicates that after the renovation phase[11] of the property, a monthly rent

---

9. In the hearing before the circuit court, TSN's CEO, Dennis Nurkiewicz, testified that TSN assists county-level emergency services organizations by providing personnel training, certification and licensure; ambulance inspection; the development of treatment protocols; etc.

10. This Court long ago indicated that "real estate is not exempt where owned by a [charitable] organization and is leased for private purposes, notwithstanding the application of the income from rentals to charitable and benevolent purposes and upkeep of the premises." *Central Realty Co. v. Martin*, 126 W.Va. 915, 923, 30 S.E.2d 720, 725 (1944). *See also State v. McDowell Lodge, No. 112*, 96 W.Va. 611, 123 S.E. 561 (1924) (holding that property of a charitable and benevolent organization, leased for profit, is not exempt even though rents are used to retire debt, for maintenance of property, and for charitable and benevolent purposes).

11. Concerning the renovation phase, the lease provides,

> for a "Renovation Phase" which is a period beginning on April 1, 2000, and not exceeding seven (7) months. During this Renovation Phase, Landlord will remodel the Premises to meet the Tenant's specifications. Tenant has

paid Landlord a security deposit in the amount of One Thousand Seven Hundred and Fifty Dollars ($1750.00) prior to the signing of this Lease. Tenant will pay monthly rent payments for April and May of 2000 in the amount of One Thousand Seven Hundred and Fifty Dollars ($1750.00). Tenant will pay monthly rent payments for June, July, August, September, and October of 2000 in the amount of Three Thousand Six Hundred and Seventy–Five Dollars ($3675.00). The parties anticipate that rent paid during the Renovation Phase will exceed Landlord's mortgage payments and expenses related to the ownership of the building. Upon completion of the Renovation Phase, Landlord will apply at least 75% of the rent payments received in excess of its actual monthly mortgage payments directly to reducing the principal of the mortgage and retain any remaining rent proceeds for payment of expenses related to the Landlord's ownership of the Premises.

This paragraph was subsequently amended to reflect that TSN would pay monthly rental payments of $5,500.00. It was further amended to provide that,

> The requirement that the Landlord apply at least 75% of the rent payment in excess of Landlord's monthly mortgage payments during

payment was to be established which would be an amount at least equal to AEMS' monthly mortgage payment. Subsequently, increases in rent payments would be only by mutual consent of the parties and would only be requested to defray AEMS' expense in owning the building or to accelerate the reduction of amortized debt. Also, the lease contains a provision concerning AEMS' application of the rent proceeds that provides:

> Landlord covenants that it will apply rent payments received from Tenant solely to reduce its indebtedness to the Guaranty Bank & Trust Company or to other expenses directly related to the Landlord's ownership of the Premises. On or before June 30th of each year, Landlord will apply at least 75% of the rent payments received in excess of its actual monthly mortgage payments directly to reducing principal of the mortgage and retain any remaining rent proceeds for payment of expenses related to the Landlord's ownership of the Premises.

In addition, Dennis Nurkiewicz, TSN's CEO, testified at the circuit court hearing that, at that time, both AEMS' mortgage payment and TSN's lease payment were $5,100.00 per month. Mr. Nurkiewicz explained that previously TSN was paying $5,500.00 per month in lease payments, but that AEMS decreased the lease payments to the same amount as the mortgage payments due to the fact that the escrow account for building maintenance had increased to a sufficient level.

the Renovation Phase directly to reducing the principal of the mortgage is hereby amended to provide that rent overpayments accrued to Landlord during the Renovation Phase will be expended for additional capital improvements to the Premises or expenses related to the ownership of the Premises.

**12.** The Tax Commissioner makes several public policy arguments to support its position that AEMS should not be exempt from paying property taxes. For example, the Tax Commissioner avers that any time a tax exempt entity acts as a landlord, it competes with other property owners who rent out their property. According to the Tax Commissioner, if a charitable entity's property was exempt from *ad valorem* taxation even though it rented that property to another party, it would enjoy a competitive advantage over other commercial lessors. From a policy perspective,

In light of this evidence, this Court concludes that AEMS is not leasing out its property for a profit. Rather, the lease payments, either in whole or substantial part, are being used to make AEMS' monthly mortgage payments. Further, any portion of the lease payment not used to make the mortgage payments is placed in escrow to pay for building maintenance or repair. Therefore, we find that the circuit court clearly erred in its finding that AEMS is leasing its property for profit.[12]

In sum, we find that AEMS is deemed a charitable organization under 26 U.S.C. § 501(c)(3); the property at issue is used exclusively for charitable purposes; and the property is not being leased out for profit. Accordingly, the property is exempt from *ad valorem* property taxation pursuant to W.Va.Code § 11-3-9(a)(12) and Syllabus Point 3 of *Wellsburg*.[13]

## IV.

## CONCLUSION

For the reasons set forth above, we find that AEMS' Huntington property is exempt from *ad valorem* property taxation, and we therefore reverse the October 19, 2004, order of the Circuit Court of Cabell County.

Reversed.

STARCHER, J., concurring.

I concur in this Court's opinion and judgment in the instant case.

concludes the Tax Commissioner, leasing should not be a function of a charitable entity. Because we find that the property at issue is clearly exempt from taxation under W.Va.Code § 11-3-9(a)(12) and our rule set forth in *Wellsburg*, we need not consider the Tax Commissioner's policy arguments.

**13.** Significantly, our finding herein that AEMS is not leasing out its property at a profit is limited to the evidence before us which is that AEMS currently uses either all or a substantial portion of the lease payments to make its monthly mortgage payments and any remainder is placed in escrow to maintain its property. Therefore, our decision herein would not apply in the event that AEMS retires its mortgage but continues to collect lease payments. At such time, AEMS may lose its exemption from paying *ad valorem* property taxes.

I write separately to observe that this Court too often finds itself "flying blind" (somewhat) in cases like the instant one— that involve taxation in connection with "nonprofit" entities.

There are a number of reasons that certainty and clarity in this legal area may be elusive. There is little specific statutory or regulatory language to apply. The relevant case law in this jurisdiction is sparse, and the parties usually do not cite much law from other jurisdictions (possibly because other jurisdictions' taxation systems are different from West Virginia's, although my guess is we could find some helpful analogies—if the parties would bring them to the attention of this Court.)

Another reason this Court can find itself without a clear basis for deciding these "nonprofit taxation" cases is the competing strong public policies that are involved, such as: (1) ensuring full and adequate and fair revenue to operate government; (2) encouraging certain positive activity conducted by "nonprofit" entities; and (3) showing fairness to straightforward "for-profit" activities. Add to this mix a seemingly endless variety of factual circumstances, and the result is a recipe for jurisprudential confusion.

From one perspective, this situation calls out for more specific legislative and regulatory guidance. But the foregoing-noted strong competing public policies probably reflect strong competing interest groups, who may fear the outcome of seeking a more certain legislative or regulatory prescription of who has to pay what taxes and when—more than they fear the uncertain results of judicial application of an imprecise regulatory structure.

So, where there is a specific situation to be resolved, it may get dumped on the court system, and we do the best we can to make practical and principled decisions, on the basis of the sparse statutory and regulatory language and case law with which we have to work. Thus this Court's opinion in the instant case strikes a balance that I and my fellow Justices find to be roughly fair and consistent with the statutes, such as they are. This kind of *ad hoc* decision-making in this area will continue, presumably, unless the other branches of government speak with more specificity in this area.

Accordingly, I concur.