IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2014 Term

No. 13-0120

**FILED**

**March 26, 2014**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

UNITED HOSPITAL CENTER, INC.,
Petitioner Below, Petitioner

v.

CHERYL ROMANO, ASSESSOR OF HARRISON COUNTY,
AND CRAIG GRIFFITH, TAX COMMISSIONER,
Respondents Below, Respondents

_

Appeal from the Circuit Court of Harrison County
Honorable John Lewis Marks, Jr., Judge
Civil Action No. 11-C-124-1

REVERSED

Submitted: January 28, 2014
Filed: March 26, 2014

Michael S. Garrison, Esq.
Kelly J. Kimble, Esq.
Spilman Thomas & Battle, PLLC
Morgantown, West Virginia

Dale W. Steager, Esq.
Spilman Thomas & Battle, PLLC
Charleston, West Virginia
Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Katherine A. Schultz, Esq.
Senior Deputy Attorney General
Charleston, West Virginia
Counsel for Respondent Griffith

James Armstrong, Esq.
Harrison County Courthouse
Counsel for Respondent Romano

JUSTICE LOUGHRY delivered the Opinion of the Court.
CHIEF JUSTICE DAVIS dissents and reserves the right to file a dissenting opinion.

SYLLABUS BY THE COURT

1. "Under section 1, art. 10, Const., the exemption of property from taxation depends on its use. To warrant such an exemption for a purpose there stated, the use must be primary and immediate, not secondary or remote." Syllabus, *State ex rel. Farr v. Martin,* 105 W.Va. 600, 143 S.E. 356 (1928).

2. "In order for real property to be exempt from ad valorem property taxation, a two-prong test must be met: (1) the corporation or other entity must be deemed to be a charitable organization under 26 U.S.C. § 501(c)(3) or 501(c)(4) as is provided in 110 C.S.R. § 3-19.1; and (2) the property must be used exclusively for charitable purposes and must not be held or leased out for profit as is provided in W. Va. Code § 11-3-9." Syl. Pt. 3, *Wellsburg Unity Apartments, Inc. v. County Comm'n of Brooke County*, 202 W.Va. 283, 503 S.E.2d 851 (1998).

3. "A constitutional provision authorizing legislative exemption of property from taxation is strictly construed and nothing can be exempted that does not fall within its terms; but rational construction within the terms used is required as well as permitted." Syl. Pt. 3, *State v. Kittle*, 87 W.Va. 526, 105 S.E. 775 (1921).

i

4. A healthcare corporation, qualified as a charitable organization under federal law, whose construction of a replacement hospital facility is substantially complete on the legal date of assessment and who has significant departmental staff on site working to fulfill the organization's charitable purposes, comes within the spirit, purpose, and intent of the constitutional framers for purposes of entitlement to exemption from ad valorem property taxation pursuant to West Virginia Code § 11-3-9(a)(12) (2013).

LOUGHRY, Justice:

The petitioner, United Hospital Center, Inc. (the "Hospital"), appeals from the January 7, 2013, order of the Circuit Court of Harrison County by which the respondents, Cheryl Romano, the Assessor of Harrison County, and Craig Griffith, the West Virginia Tax Commissioner,[1] were granted summary judgment with regard to the Hospital's dispute of its 2011 assessment of ad valorem property taxes for its newly-constructed facility located in Bridgeport, West Virginia. Given the charitable purpose of its operations, the Hospital challenges the circuit court's ruling that it was not entitled to exemption from property taxes for the subject tax year. In rejecting the Hospital's appeal, the circuit court focused on the fact that the Bridgeport location was not physically housing and treating patients on July 1, 2010.[2] The Hospital argues that not only was the lower court's application of the statutory exemptions at issue contrary to legislative authorization, but it produced a result clearly adverse to the spirit, purpose, and intent of exempting charitable organizations from ad valorem taxation. We agree.

---

[1]When this matter was initiated, Mark W. Matkovich was a named party as he was then serving as the acting tax commissioner. Mr. Griffith was automatically substituted as a party upon being named as tax commissioner. *See* W.Va. R. App. P. 41(c).

[2]By law, July 1 is the date used for property tax assessment purposes. *See* W.Va. Code § 11-3-1(2013). Due to delays precipitated by a water line break, the transfer of the Hospital's patients from its Clarksburg facility to the Bridgeport facility did not occur until October 3, 2010.

1

## I. Factual and Procedural Background

For years, the Hospital owned and operated a hospital in Clarksburg, West Virginia, which was exempt from ad valorem property taxes. This exemption was premised on the undisputed operation of the Hospital for charitable purposes.[3] In 2006, the Hospital began construction on a new hospital in Bridgeport to replace the aging Clarksburg facility.[4]

On July 1, 2010–the date used for property tax assessment purposes–the transfer of patients from the Clarksburg facility to the Bridgeport facility had not yet occurred. Due to unexpected issues,[5] the physical relocation of patients and physicians was delayed until October 3, 2010.[6] Although the doors were not open to patients on July 1, 2010, the Bridgeport facility was 95% complete from a construction standpoint. Prior to July 1, 2010, the Hospital's information technology ("IT") department was both situated and operating to support the Clarksburg hospital facility's needs from the Bridgeport locale. In addition to the IT employees, security employees were on site working at the new hospital as well as housekeeping staff and climate engineers.

---

[3]As a qualifying charitable corporation, the Hospital was not required to pay federal income tax, state franchise tax, or state income tax with regard to its Clarksburg operation.

[4]An alternate location was chosen for the new facility as there was insufficient real estate on which to expand or build a new hospital at the Clarksburg locale.

[5]*See supra* note 2.

[6]The original plan was for the relocation of patients and staff to occur prior to July 1, 2010.

In timely filing its commercial property tax report on June 30, 2010, the Hospital reported the cost of building materials and other tangible personal property incorporated into the Bridgeport facility as having a cumulative cost of $108,006,015.80. The Assessor determined that this tangible personal property had an assessed value of $62,895,013.00 and the real estate had an assessed value of $1,219,260.00.

Pursuant to West Virginia Code § 11-3-24a (2013), the Hospital inquired of the respondent assessor by written correspondence dated October 18, 2010, as to whether its Bridgeport facility was subject to ad valorem property taxes for 2011.[7] In a letter dated October 25, 2010, the assessor concluded the property was taxable, reasoning that "the property was not being used for any purpose; let alone a charitable purpose" on the July 1st assessment date. The Hospital requested a tax ruling from the State Tax Commissioner, who, by letter dated February 28, 2011, similarly advised that the property was taxable.[8]

On March 29, 2011, the Hospital filed its petition for appeal of the State Tax

---

[7]Respondents agree that the Bridgeport hospital facility is exempt from ad valorem property taxation for the 2012 tax year and all subsequent years provided its "use remains in conformity with provisions of West Virginia Code § 11-3-9(a)(12)."

[8]In reaching its decision, the tax commissioner relied heavily on a regulation that addresses when construction initiated on vacant land intended for hospital purposes shall be viewed as exempt from ad valorem taxation. *See* 110 C.S.R. § 3-24-17.3 (providing that "such property shall not be exempt . . . until it has been put to such actual use as to make the primary and immediate use of the property charitable").

3

Commissioner's ruling on the issue of taxability in the Circuit Court of Harrison County.[9]

The circuit court, without the benefit of an evidentiary hearing, issued its ruling on January

7, 2013, granting summary judgment to the respondents.  It is from this adverse ruling that

the petitioner seeks relief.

## II.  Standard of Review

Because this case involves both the interpretation of statutes and regulations,

our review is *de novo*.  *See* Syl. Pt. 1, *Appalachian Power Co. v. State Tax Dep't*, 195 W.Va.

573, 466 S.E.2d 424 (1995) ("Interpreting a statute or an administrative rule or regulation

presents a purely legal question subject to *de novo* review."); *see also* Syl. Pt. 1, *Chrystal*

*R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal

from the circuit court is clearly a question of law or involving an interpretation of a statute,

we apply a *de novo* standard of review."); Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451

S.E.2d 755 (1994) ("A circuit court's entry of summary judgment is reviewed *de novo*.").

With this plenary standard in mind, we proceed to consider whether the circuit court erred

in ruling that the Hospital was not entitled to a property tax exemption for its Bridgeport

facility for the tax year 2011.[10]

---

[9]*See* W.Va. Code § 11-3-25 (2013) (providing relief in circuit court from erroneous assessments).

[10]2011 is the only tax year in dispute.  *See supra* note 7.

4

### III. Discussion

At the core of this appeal is the availability of an exemption from ad valorem property taxation that is premised on the organization's charitable purposes. After first requiring that "taxation shall be equal and uniform throughout the State," our constitution further recognizes that "property used for educational, literary, scientific, religious or charitable purposes . . . may by law be exempted from taxation." W.Va. Const. art. X, § 1; *see In re Hillcrest Mem'l Gardens, Inc*., 146 W.Va. 337, 341, 119 S.E.2d 753, 755 (1961) ("Constitution . . . does not of itself exempt any property from taxation[;] it merely authorizes legislative exemption thereof.'") (quoting *State v. Kittle*, 87 W.Va. 526, 533, 105 S.E. 775, 777 (1921)).

Pursuant to authority reposed by article X, section 1, the Legislature enacted West Virginia Code § 11-3-9 (2013) for the purpose of specifying which classifications of property are exempt from taxation. The Hospital relies on two separate subsections of section nine to assert its entitlement to exemption: subsections (a)(12) and (a)(17). Under the more generic provisions of subsection 12, a tax exemption is extended in broad fashion to all "[p]roperty used for charitable purposes and not held or leased out for profit." W.Va. Code § 11-3-9(a)(12). Under a more specific provision directed at hospitals, a tax exemption exists for "[p]roperty belonging to . . . any hospital not held or leased out for profit." W.Va. Code § 11-3-9(a)(17). A qualification which applies solely to "educational,

5

literary, scientific, religious or other charitable corporations" seeking a tax exemption is that "such property . . . [must be] used *primarily and immediately* for the purposes of the corporations or organizations." W.Va. Code § 11-3-9(d) (emphasis supplied).

In support of its position that the Hospital was not entitled to the subject tax exemption for the 2011 tax year, the respondents focus primarily on the fact that as of July 1, 2010, the Bridgeport facility did not have its doors physically open to the public. As a result, the respondents maintain that no charitable purpose was being achieved which would permit a tax exemption. Upon a careful examination of the issues presented by this case, we are compelled to conclude that the analytical approach taken by the respondents is unduly narrow in scope. To suggest that the cynosure of demonstrating an organization's charitable purpose hinges on the swinging of its doors–especially in this day of voluminous regulations which govern both qualification as a charitable organization and approval to construct and operate a hospital facility–indicates a rather myopic view of the realities of both construction and health care law. With full awareness of the regulatory complexity of modern corporate existence, the determination of the Hospital's entitlement to exemption from ad valorem property tax requires a seemingly anachronistic examination of the historical basis of tax exemptions in this state against the purposes which they continue to serve today.

6

## A. Historical Recap of Tax Exemption

In *State v. Kittle,* 87 W.Va. 526, 105 S.E. 775 (1921), this Court was called upon to decide whether a parsonage that was no longer occupied by a minister was entitled to a tax exemption from ad valorem property taxes that applied then to "property used exclusively for divine worship; parsonages, and the household goods and furniture pertaining thereto."[11] *Id.* at 532, 105 S.E. at 777. Because the statutory language requiring that such property must be used primarily and immediately for the use of the corporation or organization was not then a part of our judicial or codified law,[12] we do not rely on the reasoning the Court employed to find that the parsonage property was tax exempt.[13] *See*

---

[11]The current version of the statutory exemption is framed separately in terms of "[p]roperty used exclusively for divine worship" and "[p]arsonages and the household goods and furniture pertaining thereto." W.Va. Code § 11-3-9(a)(5), (6).

[12]While not codified until 1945, this Court recognized in the syllabus of *State ex rel. Farr v. Martin,* 105 W.Va. 600, 143 S.E. 356 (1928), that exemption from taxation required usage that was "primary and immediate, not secondary or remote."

[13]In answering the pivotal question in *Kittle* of whether non-ministerial occupancy transformed the status of the parsonage, this Court observed:

> Acquisition and disposition of parsonages are necessarily incident to the right to hold them and, while they are owned and used as such, they are exempt. Unrestrained exemption of parsonages clearly extends to property in course of preparation for such use and to property in process of disposition, after discontinuance thereof, or held in vacancy pending determination as to its ultimate disposition. Exemption does not . . . depend upon use of the property for parsonage purposes.

87 W.Va. at 533, 105 S.E. at 777.

7

W.Va. Code § 11-3-9(d). What we find instructive, however, is the general discussion regarding our parent state's liberal policy with respect to exemption. Looking to Virginia law as a source of history, progress, and development with regard to tax exemptions we observed the following:

> No reason is perceived why the history and development of the organic provision in question, as disclosed by previous legislation in Virginia, the parent state, and provisions of its constitutions, may not be considered upon this inquiry. . . While, technically, constitutional provisions may not be acts *in pari materia*, they are of the same nature as such acts. They reveal the history, progress and development of the constitutional provision and thus cast light on its true meaning. . . . Hence we do not hesitate to resort to the Virginia statutes and constitutional provisions relating to this subject.
> Turning to them, we find the state's policy respecting exemption was liberal. . . .

*Kittle*, 87 W.Va. at 530-31, 105 S.E. at 776.

As we explained in *Kittle*, there was little "restraint upon legislative authority to exempt property," noting that a simple majority vote by each house of the general assembly of Virginia was all that was necessary to create a tax exemption. *Id.* at 531, 105 S.E. at 776. In contrast or, more accurately, in direct response to what was viewed as unfavorable tax treatment of western Virginia's citizenry,[14] this state's first constitution

---

[14]As one commentator has observed:

> More than differences over slavery and possibly more than the
> (continued...)

8

identified with specificity the permissible "subjects of legislative exemption."[15] *Id.* After

characterizing this state's initial actions with regard to tax exemptions as "cutting down this

[formerly] unlimited power," we observed that our founding fathers "used the most general

terms conceivable, in the enumeration of permissible subjects of exemption." *Kittle*, 87

W.Va. at 532, 105 S.E. at 777. Those subjects denominated in this state's first constitution

continue to comprise the scope of legislative exemption from ad valorem taxation.[16]

---

[14](...continued)

> location of the Union and Confederate forces in 1862, the rankling feeling that Virginia legislation and administration had consistently given the western counties the short end of the stick sparked the movement for separation. The reports of the constitutional convention make it quite plain that, on this specific matter of taxation, the feeling obtained generally that the plenary legislative discretion had been so exercised as to discriminate against western Virginia, inducing in the delegates a purpose to restrict that discretion so as to preclude regional favoritism in the new state. Accordingly the constitution particularized the categories exemptable by specifying, after the routine equality and uniformity clause, "but property used for educational, literary, scientific, religious or charitable purposes, and public property, may by law be exempted from taxation."

Albert S. Abel, *Public and Public Welfare Property Tax Exemption in West Virginia*, 55 W.Va. L. Rev. 170, 172 (1953) (quoting W.Va. Const. art. VIII, § 1 (1863) and omitting footnote).

[15]The delineated subjects of tax exemption were educational, literary, scientific, religious or charitable purposes, cemeteries, and public property. *See* W.Va. Const. art. VIII, § 1 (1863).

[16]*See supra* note 15.

As we recognized in *Reynolds Memorial Hospital v. Marshall County Court*, 78 W.Va. 685, 90 S.E. 238 (1916), "[w]hether or not property may be exempted from taxation . . . depends on the use to which it is applied."[17] *Id.* at 687, 90 S.E. at 239. The nature of the property's usage is critical, as we clarified in the syllabus of *State ex rel. Farr v. Martin*, 105 W.Va. 600, 143 S.E. 356 (1928): "Under section 1, art. 10, Const., the exemption of property from taxation depends on its use. To warrant such an exemption for a purpose there stated, the use must be primary and immediate, not secondary or remote." At issue in *Farr* was whether income realized from a school's lease of property held in trust for it to third parties was tax exempt. Of significance to the Court was the fact that use of the property directly benefitted the lien holders rather than the school.[18] 105 W.Va. at 602, 143 S.E. at 356. After observing that "[t]he statute excludes the exemption of property or income which redounds to private profit," the Court denied the exemption in *Farr* because neither "the property or its income was *used* for educational purposes during that year." *Id.*

In *Central Realty Co. v. Martin*, 126 W.Va. 915, 30 S.E.2d 720 (1944), we addressed the effect that commercial use of property owned by a charitable organization had on tax exemption. The property's use by "four purely commercial enterprises operat[ing]

---

[17]For purposes of entitlement to tax exemption, the use of a cemetery or public property is immaterial. *See Reynolds Mem' Hosp.*, 78 W.Va. at 687, 90 S.E. at 239; W.Va. Const. art. X, § 1.

[18]The taxpayer admitted that none of the rental income was applied to the school for the subject tax year.

for private profit" served to remove the subject property from the "letter or spirit of the constitutional provision relating to the exemption of property from taxation." *Id.* at 921, 30 S.E.2d 724. Attempting to distill the parameters of "immediate and primary use," this Court stated:

> [W]here real estate is used solely by an organization for educational and charitable purposes and such use is immediate and primary the constitutional exemption from taxation applies, and the statute enacted in pursuance thereof inhibits any assessment for taxation; but real estate is not exempt where owned by a like organization and is leased for private purposes, notwithstanding the application of the income from rentals to charitable and benevolent purposes and upkeep of the premises.

*Id.* at 923, 30 S.E.2d 725. *Central Realty* makes clear that the introduction of a profit-making element, despite application of a portion of those profits to the upkeep of the otherwise charitable property, fully extinguishes the constitutional basis for the exemption.

## B. Modern Application of Tax Exemption

More recently, this Court examined the elements necessary for a charitable organization's entitlement to exemption from ad valorem property taxation in *Wellsburg Unity Apartments, Inc. v. County Commission of Brooke County*, 202 W.Va. 283, 503 S.E.2d 851 (1998). After restating the use test announced in *Reynolds Memorial Hospital* and later clarified in *Central Realty,* we declared as "indisputable" the precept "that property used for charitable purposes which is not held or leased for profit is exempt from ad valorem real property taxation." *Id.* at 287, 503 S.E.2d at 855. In syllabus point three of *Wellsburg,*

11

we resolved that

> [i]n order for real property to be exempt from ad valorem property taxation, a two-prong test must be met: (1) the corporation or other entity must be deemed to be a charitable organization under 26 U.S.C. § 501(c)(3)[19] or 501(c)(4) as is provided in 110 C.S.R. § 3-19.1; and (2) the property must be used exclusively for charitable purposes and must not be held or leased out for profit as is provided in W. Va. Code § 11-3-9.

202 W.Va. at 284, 503 S.E.2d at 852 (footnote added).

Because there is no dispute as to the Hospital's qualification as a charitable organization pursuant to federal law, we proceed to examine whether the second prong of the test adopted in *Wellsburg* has been established. This second prong derives from the language of West Virginia Code § 11-3-9(a)(12), which extends tax exemption to "property used for charitable purposes and not held or leased out for profit." Just as there is no dispute over the Hospital's qualification as a charitable organization for purposes of federal tax law, the respondents similarly do not raise an issue with regard to the subject property being "held or leased out for profit." W.Va. Code § 11-3-9(a)(12). The respondents' sole focus is whether the Bridgeport hospital facility was being used for charitable purposes on the

---

[19]In syllabus point one of *Wellsburg*, we held that "[w]hen a corporation is granted a tax exempt status under Section 501(c)(3) of the Internal Revenue Code of 1986, that corporation is deemed to be a charitable organization under 110 C.S.R. § 3-19.1." 202 W.Va. at 284, 503 S.E.2d at 852.

legal date of assessment.[20]

In deciding whether the subject property was being used for charitable purposes in *Wellsburg*, we began our analysis with a review of what constitutes "charity" for tax purposes.  Pursuant to legislative regulation, "charity" is defined to include:

> a gift to be applied consistently with the existing laws, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government.  It is immaterial whether the purpose is called charitable in the gift itself if it is so described as to show that it is charitable.  Any gift not inconsistent with existing laws which is promotive of science or tends to the education, enlightenment, benefit or amelioration of the condition of mankind or the diffusion of useful knowledge, or is for the public convenience is a charity.

202 W.Va. at 287, 503 S.E.2d at 855 (quoting 110 C.S.R. § 3-2.10 (1989)).  An additional regulation, directed specifically at property used for charitable purposes, provides that:

> [c]harities must be operated on a not-for-profit basis, must directly benefit society, must be for the benefit of an indefinite number of people, and must be exempt from federal income taxes under 26 U.S.C. § 501(c)(3) or 501(c)(4).  Morever, in order for the property to be exempt, the primary and immediate use of the property must be for one or more exempt purposes.

110 C.S.R. § 3-19.1 (1989).

_____

[20]The respondents recognize that charitable purposes were being met as of October 3, 2010, when the hospital doors were open to the public.  *See supra* note 7.

Applying those regulatory definitions to the facts in *Wellsburg*–a charitable organization that provided housing for the elderly or low income individuals–this Court affirmed the trial court's finding that the property was used for charitable purposes as it was "being used for purposes of relieving poverty and for other purposes which are beneficial to the community." 202 W.Va. at 289, 503 S.E.2d at 857. In similar fashion, we concluded in *Appalachian Emergency Medical Services, Inc. v. State Tax Commissioner*, 218 W.Va. 550, 625 S.E.2d 312 (2005), that leased property owned by a non-profit charitable corporation came within the definition of "charity" because the property was being used to further the corporate mission of assisting emergency services organizations to relieve human suffering. *Id.* at 555, 625 S.E.2d at 317.

Admittedly, neither *Wellsburg* nor *Appalachian Emergency* involved the exact issue presented here: whether a newly constructed hospital can serve its charitable purposes before John Q. Public walks through the door. In support of their position, the respondents look to two additional regulations that apply solely to hospitals to reach their conclusion that charitable purposes were not being met on the assessment date of July 1, 2010. Pursuant to 110 C.S.R. § 3-24.17.1 (1989), "[w]hen a hospital purchases land which it intends to use for capital improvements, which will be used for charitable purposes, the land shall not be exempt so long as the land is vacant." In explanation of this disallowance, the regulation provides "[s]o long as the land is vacant, it can be sold and used for noncharitable

purposes." *Id.* By regulation, land on which construction has begun for hospital purposes falls within the scope of permissible tax exemption when "it has been put to such *actual use* as to make the *primary and immediate* use of the property charitable in accordance with Section 19 of these regulations." 10 C.S.R. § 3-24.17.3 (emphasis supplied).

The respondents have seized upon the emphasized language in the above-quoted regulation to argue that "immediate" necessarily indicates a sense of time and that "actual use" means the equivalent of occupancy. Based upon our exacting inquiry of the historical basis for and development of the subject tax exemption, we are convinced that the respondents have incorrectly interpreted the subject terminology. Their contention that "immediate" was intended to describe a contemporaneous physical usage is wholly at odds with how that term has been employed over the years. Rather than serving as a modifier couched in temporal terms, its syntactic function has always been used to indicate directness. This comports with the primary definition of "immediate" provided by the dictionary, which is "acting or being without the intervention of another object, cause, or agency: DIRECT." Merriam Webster's Collegiate Dictionary, p. 579 (10th ed. 1994). Significantly, when the phrase "primary and immediate" first appeared on our judicial landscape with regard to ad valorem taxation, it was followed by the explanatory phrase "not secondary or remote." *See* Syllabus, *Farr*, 105 W.Va. at 600, 143 S.E. at 356. Given this seminal judicial explanation that the meaning of "primary and immediate" usage stands in contrast to "secondary or

15

remote" usage combined with the fact that "direct" is a long-recognized synonym for the term "immediate," we conclude that the term "immediate" was not intended to connote a temporal requirement when conjoined to "primary" for tax exemption purposes. *See id.*

We proceed to address the respondents' claim that the regulatory inclusion of the phrase "actual use" fully resolves the question of the Hospital's entitlement to a tax exemption. The respondents argue that the non-use of the Hospital for patient-treating purposes on July 1, 2010, necessarily prohibits the Bridgeport facility from qualifying as charitable on such date. The context in which "actual use" is employed in 110 C.S.R. § 3-24.17.3 is tied to "mak[ing] the primary and immediate use of the property charitable within the meaning of section 19 of the regulations."[21] While the respondents do not take issue with the Hospital's qualification as a charitable organization under federal law or its operation on a non-profit basis, they do contend that it was not serving charitable purposes on July 1, 2010, as they maintain that it could neither directly benefit society nor benefit an

---

[21]Section 19.1, the foundational regulation of this section, provides as follows:

> Charities must be operated on a not-for-profit basis, must directly benefit society, must be for the benefit of an indefinite number of people, and must be exempt from federal income taxes under 26 U.S.C. § 501(c)(3) or 501(c)(4). Moreover, in order for the property to be exempt, the primary and immediate use of the property must be for one or more exempt purposes.

110 C.S.R. § 110-3-19.1.

16

indirect number of people with its doors closed to the public.[22]  We disagree.

Because the Hospital had relocated its IT department prior to July 1, 2010, to the Bridgeport facility and because that department was fully engaged in providing technology support services necessary to keep the Clarksburg hospital operating until the Hospital was able to fully complete its move to the new facilities, the IT employees were utilizing the physical premises of the Bridgeport facility to accomplish the undisputed charitable purposes of the Hospital.[23]  In this day and age, the integral nature of an organization's IT department cannot be seriously debated.  Without the IT department and its attendant corporate ability to enable the myriad uses of technology required in a modern hospital, a healthcare facility would be incapable of retrieving patient information; meeting the pharmaceutical needs of those patients; processing insurance and payment information; conducting research; operating its security systems; communicating interdepartmentally; and completing innumerable additional functions necessary to meet the quotidian needs of both staff and patients.  In addition to the IT department and its employees, the Hospital had housekeeping employees working to prepare the facilities for the imminent arrival of patients; security employees who were actively guarding the premises; and environmental employees in charge of overseeing the climate needs of the facility.  All of these employees

_____

[22]*See supra* note 21.

[23]The fact that the healthcare services were being provided at the Clarksburg property does not negate the physical use of the Bridgeport property to meet the Hospital's IT needs.

17

who were physically present at the Bridgeport facility were either directly contributing to the provision of charitable purposes that were taking place at another location or they were readying the Bridgeport premises for the facility's forthcoming admission of patients.[24]

Upon analysis, we are simply not persuaded by the respondents' contention that on-site physical provision of charitable healthcare is the *only* means by which the Hospital can demonstrate the requisite "actual use" of the Bridgeport property for charitable purposes. While the respondents wish to view the Hospital's entitlement to an ad valorem tax exemption solely under the regulations that pertain to hospitals, section nineteen of the subject regulation makes clear that the use of the property "must be for one or more exempt purposes." 110 C.S.R. § 110-3-19.1. In short, if the Hospital qualifies under the more general purpose of simply using its property for charitable purposes and not being held or leased out for profit, that is sufficient. *See* W.Va. Code § 11-3-9(a)(12); *Reynolds Mem'l Hosp.*, 78 W.Va. at 687, 90 S.E. at 239 ("If the property is used for charitable purposes

---

[24]Due to the physical use of the subject property for work that qualifies as integral to the provision of charitable healthcare services, we find it unnecessary to decide whether the construction process itself can be viewed as a necessary part of an organization's provision of charitable services. We note, however, that other courts have ruled accordingly. *See, e.g., Abbott Ambulance, Inc. v. Leggett*, 926 S.W.2d 92, 95 (Mo. App. 1996) (stating that "use of the property in constructing the facility as a prerequisite to such [charitable] use should likewise be considered a charitable use"); *Overmont Corp. v. Board of Tax Revision,* 388 A.2d 311, 312 (1978) (ruling that construction of facilities by charity constitutes use for purposes of tax exemption and observing that "[t]o hold otherwise would tend to impede the purposes for which the tax exemption was created").

within the meaning of the Constitution, then it is exempt from taxation; if it is not so used it is not exempt"); *accord State ex rel. Cook v. Rose*, 171 W.Va. 392, 394, 299 S.E.2d 3, 5 (1982) ("Therefore, a hospital may only be entitled to a property tax exemption for property not held or leased out for profit *and* used solely for charitable purposes."). Rather than its operation as a hospital per se, it is the dispensation of charity that determines the Hospital's entitlement to an exemption in this case.

Our conclusion on this issue is further buttressed by an examination of the objective underlying the regulation upon which the respondents rely. In withholding a tax exemption for property purchased by a hospital intended for construction until there is a clear indication that charitable purposes will be accomplished on such property, the Legislature stated its valid concern that the vacant property might be sold and used for noncharitable purposes. *See* 110 C.S.R. § 3-24.17.1. As of July 1, 2010, with construction of the Bridgeport hospital facility 95% complete and multiple departments already located and operating on site, the possibility that the Hospital would seek to sell this property to a profit-seeking entity had long since passed. Consequently, we think it somewhat disingenuous of the respondents to rely upon a regulation aimed at securing the extension of tax exemptions to property with indisputable indicia of charitable purpose usage. On the assessment date, it strains credulity to suggest that any doubt remained regarding the use of the Bridgeport property for charitable purposes. And, as discussed above, the property was

in fact currently being used to accomplish charitable purposes–albeit at another location.

What has always been pivotal in any determination regarding entitlement to tax exemption is the absence of profit making combined with the concurrent incident of public beneficence. In exchange for the indisputable benefits to society, which typically have a consequent reduction in governmental burdens, a tax exemption is extended to the charitable provider. *See Bethesda Gen'l Hosp. v. State Tax Comm'n*, 396 S.W.2d 631, 633-34 (Mo. 1965) (recognizing that charitable exemptions are given in return for performance of functions which benefit public, and consequently relieve state's burden to care for and advance interests of its citizenry); Abel, *supra*, 55 W.Va. L. Rev. at 188 (stating that rationale of extending tax exemption for charitable purposes "is a reciprocal of benefit conferred on the people of the state by the exemption beneficiary"). The respondents do not challenge the benefits that the Hospital confers on this state's citizens through its now fully-operational Bridgeport facility. Instead, they seek to benefit from the construction-related delays over which the Hospital appears to have had little control.[25] Not only do we find their approach unduly restrictive, but we have little doubt that it is not in keeping with what this state's constitutional framers intended.

While the respondents seek to offensively apply the rule of strict construction

[25]*See supra* note 2.

with regard to the extension of tax exemptions,[26] they overlook the corollary requirement

that such construction must be rational. *Patterson Mem'l Fund v. James*, 120 W.Va. 155,

157, 197 S.E. 302, 303 (1938) ("While judicial construction of tax exemptions should be

strict, it should be rational.") (*overruled on other grounds* as stated in *Central Realty, see*

Syl. Pt. 3, 126 W.Va. 915, 30 S.E.2d 720). As we held in syllabus point three of *Kittle*, "[a]

constitutional provision authorizing legislative exemption of property from taxation is

strictly construed and nothing can be exempted that does not fall within its terms; but

rational construction within the terms used is required as well as permitted." 87 W.Va. 526,

105 S.E. 775. This Court provided additional enlightenment, stating in *Kittle*:

> The only arbitrary requirement of the rule of strict construction, however, is that its subject matter must be within the terms, as well as the spirit, of the provision under construction. It does not require assignment to terms actually used, of the most restricted meaning of which they are susceptible, nor any particular meaning. So long as the court stays within the terms used, it may give effect to the spirit, purpose, and intent of the makers of the instrument. The rule permits, and other law requires, rational interpretation within the terms actually used.

87 W.Va. at 529-30, 105 S.E. at 776; *see also Mountain View Cemetery Co. v. Massey*, 109

W.Va. 473, 477, 155 S.E. 547, 549 (1930) (observing that "a strict construction must be

---

[26]"Constitutional and statutory provisions exempting property from taxation are strictly construed. It is incumbent upon a person who claims his property is exempt from taxation to show that such property clearly falls within the terms of the exemption; and if any doubt arises as to the exemption, that doubt must be resolved against the one claiming it." Syl. Pt. 2, *Hillcrest Mem'l Gardens*, 146 W.Va. at 337, 119 S.E.2d at 754.

reasonable and not limited so as to defeat the underlying purpose of the statute"); *accord*

*Trotter v. Tennessee*, 290 U.S. 354, 356 (1933) (recognizing that tax exemptions "are not

to be read so grudgingly as to thwart the purpose of the lawmakers").

Our review of this state's tax exemption laws reveals that the overarching

concern in looking to a property's usage was to ensure that such usage properly fell within

the scope of the state's enumerated subjects entitled to tax exemption. *See* W.Va. Const. art.

X, § 1. Given the inarguable benefits that inure to society from the provision of charitable

services, such as those provided by the Hospital, we find it doubtful that the constitutional

framers sought to deny tax exemption where such laudable eleemosynary purposes are being

achieved.[27] *See Prichard v. County Court of Kanawha County,* 109 W.Va. 479, 486, 155

S.E. 542, 545 (1930) (observing that "it is the purpose of our state under its tax laws to deal

liberally with and foster and encourage all charitable and educational institutions when their

conduct and operation does not result in private gain") (*overruled on other grounds* as stated

---

[27]The Hospital observes that if it is required to pay ad valorem property taxes on the Bridgeport property for tax year 2010, there will be a consequent reduction in funds available to meet its charitable purposes. *See Abbott Ambulance*, 926 S.W.2d at 97 (observing that "[d]enial of an exemption during construction of a facility which is to be used for an unquestionably charitable activity necessarily increases the cost, thereby diminishing the charity's ability to carry out its activities for the benefit of the public"). We note that the Hospital, in keeping with our state regulations, did pay ad valorem taxes on the Bridgeport property from the time of the property's purchase in 2006 through 2010. *See* 110 C.S.R. § 3-24.17.1. At such time, the property had not yet begun to be used for charitable purposes. *Id.* at § 3-24.17.3.

in *Central Realty, see* Syl. Pt. 3, 126 W.Va. 915, 30 S.E.2d 720). Rather than a "gotcha" type of calendar-focused interpretation, we are convinced that a rational construction of the tax exemption extended by West Virginia Code § 11-3-9(a)(12) is required by the facts of this case. And by applying that type of a construction, we are compelled to conclude that charitable purposes were unquestionably being achieved by the Hospital on the legal date of assessment. Accordingly, we hold that a healthcare corporation, qualified as a charitable organization under federal law, whose construction of a replacement hospital facility is substantially complete on the legal date of assessment and who has significant departmental staff on site working to fulfill the organization's charitable purposes, comes within the spirit, purpose, and intent of the constitutional framers for purposes of entitlement to exemption from ad valorem property taxation pursuant to West Virginia Code § 11-3-9(a)(12).

## IV. Conclusion

Based on the foregoing, the decision of the Circuit Court of Harrison County is reversed.

Reversed.

23